09 CV 6146

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SEA BIRD SHIPPING LTD.,

                                        Plaintiff,            09 CV 0146 (RJH)

-v-
                                                             VERIFIED COMPLAINT

ROSINTERAGROSERVIS LTD.,
                                        Defendant.
-------------------------------------------------------------------x

Plaintiff, SEA BIRD SHIPPING LTD. (hereinafter "SEA BIRD"), by its attorneys,

CHALOS & CO, P.C., as and for their Verified Complaint against Defendant

ROSINTERAGROSERVIS LTD. (hereinafter "ROSIN"), alleges upon information and belief as

follows:

### JURISDICTION

1.     The Court has subject matter jurisdiction by virtue that the underlying claim

herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28

U.S.C. § 1333.

### THE PARTIES

2.     At all times material hereto, Plaintiff, SEA BIRD, was and still is a foreign

business entity duly organized and existing pursuant to the laws of Malta.

3.     At all times material hereto, Defendant, ROSIN, was and still is a foreign business

entity duly organized and existing pursuant to the laws of Russia, with a principal place of

business at: 56, Burgasskaya Str., Krasnodar City, Krasnodar region, 350000, Russia.

FACTS AND CLAIM

4.      On April 15, 2009, SEA BIRD, as owners of the vessel M/V SEA BIRD, and Glingrow Holding Ltd., as charterers, entered into a time charter party agreement for the carriage of bulk wheat, and a duration of about forty (40) days for a trip to Egypt Red Sea/Mediterranean or Jordan. *A copy of the charter party agreement[1] is annexed hereto as Exhibit 1.*

5.      The time charter party agreement is a maritime contract.

6.      The Vessel loaded a cargo of bulk wheat at Novorossiysk, Russia, whereby two (2) bills of lading were issued, each dated April 30, 2009.  The first Bill of Lading covered 27,000 metric tons of Russian Wheat, and the second Bill of Lading covered 29,740 metric tons of Russian Wheat. *See Bills of Lading, attached hereto as Exhibits 2 and 3.*

7.      The total amount of Russian Wheat in bulk loaded on the M/V SEA BIRD, under the Bills of Lading, was 56,740 metric tons.

8.      The physical shipper of the cargo of wheat from Russia, under the Bills of Lading, was Defendant, ROSIN, on its own account, or on behalf of a third party.

9.      The port of discharge under the Bills of Lading was Safaga Red Sea Egyptian Port.  The Vessel arrived at Safaga on May 9, 2009, and gave notice of readiness for unloading of the cargo.

10.     The Egyptian authorities took samples of the cargo, whereby the cargo was deemed unfit for human consumption and the cargo could not be discharged in Egypt.

11.     On or about June 16, 2009, the Vessel was detained at Safaga.  The charterers, Glingrow Holding Ltd. have failed to pay hire to Plaintiff, SEA BIRD from June 23, 2009 onwards.

---

[1] The charter party agreement incorrectly lists the Owner as "Seabird Shipping Co. Ltd."

12.     Defendant ROSIN, has breached the Bills of Lading by failing to discharge the cargo within a reasonable time and/or for loading an unlawful and/or dangerous cargo.

13.     Due to the breach of the Bills of Lading, Plaintiff SEA BIRD has suffered losses and damage equivalent to the unpaid hire from the June 23, 2009 onwards, as well as the difference between the rate of hire under the charter party and the market rate of hire.

14.     The rate of hire under the charter party agreement is in the amount of USD $12,000.00 per day and has not been paid to Plaintiff SEA BIRD since June 23, 2009.

15.     The earliest potential release date for the M/V SEA BIRD is expected to be no sooner than thirty (30) days, or August 8, 2009, resulting in unpaid hire for a total of at least forty-seven (47) days.  Plaintiff's loss of hire damages, for which the Shippers are liable, are therefore presently estimated to be in an amount of not less than USD $533,384.37.  *See Hire Statement, attached hereto as Exhibit 4.*

16.     Pursuant to the terms and conditions of the time charter party, the Vessel was to remain chartered for a duration of forty (40) days.  The Vessel was delivered to Charterers on April 20, 2009, and therefore the forty (40) day period expired on May 30, 2009.  Allowing for a grace period of five (5) days, Plaintiff calculates that the Vessel should have been redelivered to it by Charterers on or before June 5, 2009.

17.     Due to the Defendant's failure to provide non-dangerous cargo and/or to discharge the cargo within a reasonable time, the Vessel has been unable to be re-fixed at the end of the time charter period.  The market rate of hire for a Vessel similar to the M/V SEA BIRD is presently estimated at USD $22,000.00[2] per day.  Accordingly, Defendant, ROSIN, is liable in damages to Plaintiff SEA BIRD for the difference in current market value over the period from June 5, 2009 through no earlier than August 8, 2009 (a total of at least sixty-four (64) days), less

---

[2] Plaintiff reserves its right to seek further damages if there is a change in the current market rate of hire.

3.75% commissions, for an amount presently estimated at USD $616,000.00. *See Hire Statement, attached hereto as Exhibit 4.*

18.     Pursuant to the terms of the charter party agreement, all disputes arising there under are to be submitted to London arbitration, with English law to apply.

19.     This action is brought in order to obtain security for Plaintiff's claims in aid of London arbitration proceedings.

20.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law.  Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.

21.     As best as can now be estimated, the Plaintiff, SEA BIRD expects to recover the following amounts in London Arbitration from Defendant ROSIN:

| | | |
|---|---|---|
| A. | Principal claim: | $ 1,149,384.37 |
| B. | Estimated interest on Principal claim: 3 years at 7.5%, compounded quarterly | $ 287,020.10 |
| C. | Estimated attorneys' and legal fees: | $ 250,000.00 |
| D. | Estimated arbitration and court costs: | $ 250,000.00 |
| | **Total Claim:** | **$ 1,936,404.47** |

22.     Therefore, SEA BIRD's total claim for negligence and breach of maritime contract against Defendant ROSIN is in the aggregate USD $1,936,404.47.

## BASIS FOR ATTACHMENT

23.     Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil

Procedure, but Defendant is believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendant within this District held by various parties, as garnishees, including but not limited to electronic fund transfers.

24.     Defendant is continuously engaged in international shipping and conduct business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City.  Dollars are the *lingua franca* of international commerce.

25.     All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

26.     Plaintiff believes that some of these assets of Defendant, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendant; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendant and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank,

Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank,  and Wells Fargo Bank.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.    That since the Defendant cannot be found within the District, as set forth in the Declaration of George M. Chalos (*attached hereto as Exhibit 5*), and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendant's tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendant, up to the amount of USD $1,936,404.47 to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
       July 8, 2009

CHALOS & CO, P.C.
Attorneys for Plaintiff
SEA BIRD SHIPPING LTD.

By: _____

George M. Chalos (GC-8693)
123 South Street
Oyster Bay, New York 11771
Tel: (516) 714-4300
Fax: (516) 750-9051
Email: gmc@chaloslaw.com

# EXHIBIT 1

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party**, made and concluded in *Athens*,............................................*15th*...... day of *April*.............................. ~~19~~*2009*

2 Between *Messrs Seabird Shipping Co Ltd, Malta*.............................................................................................................................

3 Owners of the good *Maltese flag*................................... ~~Steamship/~~Motorship *"SEA BIRD" - description as per Clause 29* ~~of~~ .........................

4 ~~of~~...........................~~tons gross register, and~~...........................~~tons net register, having engines of~~..................................................~~indicated horse power~~

5 ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ ..............................................................................

6 ~~at~~...........................~~of about~~...........................~~cubic feet bale capacity, and about~~...........................~~tons of 2240 lbs.~~

7 ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~

8 ~~allowing a minimum of fifty tons) on a draft of~~...........................~~feet~~...........................~~inches on~~...........................~~Summer freeboard, inclusive of permanent bunkers,~~

9 ~~which are of the capacity of about~~...........................~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10 ~~conditions about~~...........................~~knots on a consumption of about~~...........................~~tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11 now *vessel etc/s Aqaba 17th April , etr Port Said 19th April agw*...............................................................................................

12 ...........................................and *Messrs Glingrow Holding Ltd.* ........................... Charterers of the City of ..*Nicosia, Cyprus* .......

13 # Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 ~~about~~ *one time charter trip via safe port/s, berth/s, anchorage/s, place/s, on or off the direct and/or customary route or routes, in*

15 *or out of geographic rotation, always within Institute Warranty Limits, always afloat/always accessible via Black Sea to Egypt Red Sea/Mediterranean or Jordan with intention cargo of bulk wheat, duration about 40 days without guarantee* within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations*

18 *hereunder.*

Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping last outward sea pilot Port Said at any time day or night Sundays and*

19 *Holidays included*............................................................................................................................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

22 ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, *(see Clause 42)* ~~winches~~

23 ~~and~~

~~donkey-boiler with sufficient steam-power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

24 ~~time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-~~

25 ~~dise, including petroleum or its products, in proper containers, excluding (see Clause 32)~~..................................................................

26 ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27 ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29 ~~Mexico, and/or South America.~~ ............................................................................................................~~and/or Europe~~

30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

32 *(see Clause 31)*...............................................................................................................................................

33 ...............................................................................................................................................................

34 ...............................................................................................................................................................

35 as the Charterers or their Agents shall direct, on the following conditions:

36     1.    That *whilst on hire* the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler *and domestic* water, *lubricating oil, vessel's garbage removal unless compulsory* and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, *holds and hatchcovers*, machinery and equipment *with all certificates necessary to comply with current requirements at all ports of call and canals* for and during the service. *(see Clause 48 and 49)*

39     2.    That *whilst on hire* the Charterers shall provide and pay for all the fuel *and MDO* except as otherwise agreed, Port Charges, *compulsory and customary* Pilotages, Agencies, *boatage on Charterers' business for clearance and cargo purposes only*, pilotage and Dardanelles/ *Bosphorus dues to be for Charterers' account*, Commissions, *Canal dues and tolls,*

40 Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into

41 a port for causes for which *Owners are* ~~vessel is~~ responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account *including lodging expenses should port authorities order ashore for safety reasons. All fumigation materials on board the vessel to be removed at Charterers' cost, time and expense.* ~~All other fumigations to be for Charterers account after~~

~~vessel has been on charter for a continuous period~~

44 ~~of six months or more.~~

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, *as permitted under*

*this Charter Party,* but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.

48  ~~3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ................................... ~~tons and not more than~~
50  ................................... ~~tons and to be re-delivered with not less than~~ ................................... ~~tons and not more than~~ ................................... ~~tons.~~ *(see Clause 30)*

51  4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 12,000 per day prorata including overtime*
52  *payable in advance every 15 days* ............................... United States Currency ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53  ~~stores, on~~ ................................... ~~summer freeboard, per Calendar Month,~~ commencing on and from the *hour* day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* ~~month~~ hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) ~~at~~ *on passing Port Said northbound at any time day or night Sundays and Holidays*
56  *included or in Charterers' option on dropping last outward sea pilot Egypt Med at any time day or night Sundays and Holidays*
57  *included* unless otherwise mutually agreed. ~~Charterers are to give Owners not less than~~ ................................... ~~days~~
    ~~notice of vessels expected date of re-delivery, and probable port.~~

58  5.   Payment of said hire to be made *as per Clause 35* ~~in New-York in cash~~ *by transfer* in United States Currency, *every 15 days* ~~semi-monthly in~~
59  advance, and for the last *15 days* ~~half-month~~ or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  ~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject~~
66  ~~to 2-1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application~~
67  ~~of such advances.~~

68  6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in East Coast South America* where it is customary for
70  similar size vessels to safely
    lie aground.

71  7.   That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), *compatible with*
    *vessel's seaworthiness,* also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74  ~~paying Owners~~ ................................... ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers.*

76  8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, ~~and~~ trim, *lash, secure and discharge* the cargo at their *risk and* expense under the supervision of the Captain,
    *all cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (see Clauses*
    *59/60)* ~~who is to sign Bills of Lading for~~
79  ~~cargo as presented, in conformity with Mate's or Tally Clerk's receipts.~~

80  9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club*
    *boarding LOI.* ~~and see that voyages are prosecuted~~
83  ~~with the utmost despatch.~~ He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of *US$10.00 (ten dollars)* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual
    Tally
85  Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling.~~ *(see Clause 37)*

86  11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and/or*
    *telecommunication with copy to Owners,* and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English,* showing the course of the vessel and distance run and the con-
89  sumption of fuel.

90  12.   That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*

91  ~~13.   That the Charterers shall have the option of continuing this charter for a further period of~~ ...................................
92  ...................................
93  ~~on giving written notice thereof to the Owners or their Agents~~ ................................... ~~days previous to the expiration of the first-named term, or any declared option.~~

94  14.   That if required by Charterers, time not to commence before *00:01 hours local time 18th April 2009* and should vessel
95  not have ~~given written notice of readiness~~ *been delivered* on or before *23:59 hours local time, 20th April 2009* ~~but not later than 4 p.m.~~ Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97  15.   That in the event of the loss of time from deficiency *and/or default* of crew ~~men~~ *including strike of Officers and/or Crew* or
    *deficiency of* stores, fire, breakdown or damages to hull, machinery or equipment, *unless caused by Charterers and/or their agents and/or their*
    *servants,*
98  grounding, detention by average accidents to ship or cargo, *unless resulting to inherent vice, quality or defect of the cargo,* drydocking for the
    purpose of examination or painting bottom, or by any other cause

99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra *directly related* expenses shall be deducted from the hire *duly substantiated*.

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New York~~,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *(see Clause 60)*
*General Average/Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including General
111 Aver-
age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules *1974 as amended 1994* at London (see Clause 66) ~~1924, at such port or place in the United States as may be selected by the~~
~~carrier; and as to matters not provided for by these~~
117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *Hire/Bunker not to*
*contribute to General Average. (see Clause 66)*

133 20. Fuel used by the vessel while off hire, also ~~for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and *shall be for*
*Owners' account.* ~~the~~
134 ~~cost of replacing same, to be allowed by Owners.~~

135 ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *(see Clause 70)* ...............................................................................................................................................................................................................
139 ...............................................................................................................................................................................................................
140 ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *lights as on board* ~~lanterns and oil~~
for
143 night work, *free of expense to Charterers,* and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at
144 Charterers' expense. ~~The~~
~~Charterers to have the use of any gear on board the vessel.~~

145 23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore-Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~

151 ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~

155 U. S. A. Clause Paramount
156 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160 Both to Blame Collision Clause
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167     25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Ice free ports/trading, vessel not to force ice or follow ice-breakers.*
170     26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats except of strikes not against the Owners,* insurance, crew, and all other matters, same as
when trading for their own account.
172     27.  A commission of *1.25*~~2 1/2~~ per cent is payable by the Vessel and Owners to
173 *Optima Chartering Ltd.*.................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175     28.  An address commission of 2 1/2 per cent payable to *Charterers*.................................................. on the hire earned and paid under this Charter.

*Clauses numbered 29 to 83, as attached hereto, are deemed to be fully incorporated in this Charter Party.*

**THE OWNERS**                                                    **THE CHARTERERS**

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

**RIDER CLAUSES TO M/V SEA BIRD CHARTER PARTY DATED 15TH APRIL 2009**

**Clause 29**
**Description Clause**
  mv **'sea bird'** - all dtls abt
  pmax/glss sdstbc
  63789 mts sdwat on 12.85 m sdraft,
  built 1984, malta flag,
  class b.v., p+i: UK (A.BILBOROGH)
  aussie/grain fitted
  int'l grt/nrt  : 35,915 / 21,910
  suez grt/nrt   : 35,242.9/29,999.68
  panama grt/nrt : 36,758 / 31,827
  2.635.800 cbft grain
  loa/beam: 224.36/32.20 m,
  7 ho/ha - macgregor - all 16 x 13.20 m
  tpc 63.10 m/t - constants abt 600 mts excl fw
  abt 13.5 kns on abt 37/35 mts l/b ifo cst180 plus abt 3 mts
  mdo dmb at sea. port/idle abt 3 mts mdo dmb
  in good weather conditions with no adverse current and no negative
  influence of swell upto and including bf4 and douglas sea state 3.
  vsl burns mdo when manouvering in/out ports/canals/rivers/straits/
  shallow waters or when navigates in restricted waters with or without
  pilot to master's discretion as well as when ballasting/de-ballasting
  - vsls grain cubic b/down:
  hold wise capacity
  no1:364260
  no2:383394
  no3:385064
  no4:380215
  no5:378870
  no6:384884
  no7:359196
  sum:2,635,883 cbft
  - wltohc:
  full ballast condition : no1/15.00m m/14.10m no7/13.20m
                   (ballast holds not flooded)
  full ballast condition : no1/12.70m m/12.20m no7/11.70m
                   (ballast holds flooded)

  singledeck selftrimming bulkcarrier

Owners guarantee that vessel classed highest class Lloyd's Register of Shipping or equivalent
and tight, staunch and strong and in every respect fitted for Charterers' cargo/trade and will
so be maintained whilst under this Charter Party and that the ship is constructed and
equipped in accordance with SOLAS 1974 Regulations and any subsequent amendments and
that they will ensure the vessel complies with such regulations at all times under this Charter.

  owners: SEABIRD SHIPPING CO LTD, MALTA
  managers: HELLENIC STAR SHIPPING CO, ATHENS/GREECE

- owners confirm vsl is grain clean and has on board valid documents of authorization for
  carriage of grains in bulk.

**Clause 29: cont.../...**
- owners confirm that vessel is suitable for grab discharge.
- owners confirm vessel is classed highest lloyd's class and ism / isps code fitted for the whole duration of voyage.
- owners confirm vessel has all valid documents/certificates available on board for loading and draft survey.
- owners confirm that vessel is not blacklisted for load and/or discharge countries / ports and suitable for this trade.
- ownership/class/pandi club/h+m insurance not to be changed throughout whole trip duration.

- OWNERS CONFIRMED FOLL STOW PLAN:
MIN 52,500 MTS UP TO F+C IN CHOPT (WHEAT IN BULK SF ABT 46), IN CASE VESSEL LOAD MIN CGO QTTY I,E (52,500 MTS) OWNERS CONFIRM THAT VESSEL CAN SAIL W/O B/S/S OF SLAG HOLDS

- negotiation and fixture to be kept p&c by all parties involved

- LAST THREE CARGOES: WHEAT/BARLEY/SBM

- VESSEL ETC/S AQABA 17TH APR
  ETR PORT SAID 19TH APRIL AGW

**Clause 30**
**Bunker Clause**
Bunkers on delivery about 1200/1300 metric tons of HSFO and about 130 metric tons LSFO and about 30/50 metric tons of MDO.
Bunkers on redelivery to be about same as actually on board on delivery.
Charterers to take over and pay the estimated quantities to be consumed together with first hire.
Prices: USD 300 per metric ton HSFO, USD 470 per metric ton MDO.
Same prices apply on delivery and redelivery. (It is understood that LSFO is not going to be used for this trade)

**Clause 31**
**Trading Exclusions**
Trading always within Institute Warranty Limits but excluding Cuba, abkhazia, Syria, Libya, Turkish occupied Cyprus, Denmark, Norway, Sweden, Finland, Australia, Albania, New Zealand, France, Germany, Belgium, Bosnia-Herzegovina, Holland, Italy, U.K., Eire, USA, Canada, CTS Pacific Countries, Ethiopia, Eritrea, Georgia (including Abkhazia), Great Lakes, Haiti, Iraq, Iran, Israel, Cambodia, Federal Republic of (Sebia and Montenegro), Former Yugoslavia, Lebanon, North Korea, Liberia, Angola md Cabinda, Mozambique, Namibia, Mauritania, Nigeria, North and South Yemen, Sea of Azov, Siera Leone, Somalia, Sri Lanka, Sudan, Yugoslavia, Zaire, and all war like areas and all places and/or territories under United Nations sunctions either presently in force or in future imposed. Vessel not to trade directly between Taiwan and China nor to call at CIS Pacific Ports.
Should owners agree to trade war risk areas then any extra and/or additional war risk insurance premium charged by owners' underwriters (local brokers) by reason of vessel's trading under this charter party to be for Charterers' account and to be refunded to owners by Charterers upon receipt of copies of owners' underwriters/brokers' net invoices, such additional and/or extra insurance not to exceed that obtainable from the Hellenic Mutual War Risk Association on same terms n conditions as owners cover. Any blocking / trapping / detention insurance to be for Charterers' account. Any crew war bonuses in accordance with

**Clause 31: cont.../...**
crew contract of employment and/or P&I war risk areas payable by reason of vessels trading
under this charter party to be refunded to owners by Charterers against documentation.
All ice-blocked areas to be excluded. Vessel not to force ice nor to follow ice-breakers during
the currency of present charter party. Vessel not to trade lakes/not above San Lorenzo in
Parana River/not above Munguba in Amazon river/not above Matanzas in Orinoco and not
above baton rouge in Mississipi River during the currency of present charter party. Also
Haldia and Calcutta to be excluded when trading India.


**Clause 32**
**Cargo Trading Clause**
Only cargo allowed under this charter is bulk wheat or barley. All other cargoes are hereby
excluded.
Cargo to be loaded/stowed/carried/discharged in accordance with IMO, BC Code and local
regulations.


**Clause 33**
**Cuba/Eligibility Clause**
Owner represents and guarantees that Owner and its vessel are not in any way directly or
indirectly owned, controlled by or related to any Cuban or Iraqi interests. If the goods are to
be loaded or destined to the United States, (1) Iran, Sudan, Afghanistan and Libya shall be
added to this list, and (2) Owner represents and guarantees that the vessel has not called at
a Cuban port within 180 days of the vessel's estimated arrival at a United States port.
In addition, if at the time Owners nominate the performing vessel to Charterers, the
Charterers' seller or buyer of the subject cargo is a U.S. company or is otherwise subject to or
under U.S. restrictions, Charterers shall have the right to reject the nomination of any ship
that is directly or indirectly owned, controlled by or related to any Tranian and/or Libyan and
/ or Sudanese and / or Afghan interests. Without prejudice to Charterers' / Shippers' /
Receivers' other rights under this contract, Owners accept responsibility for and agree to
indemnify Charterers / shippers / receivers against any and all claims, losses, damages,
liabilities, cost (including legal fees), fines and any and all consequential losses which result
from partial or full non-compliance with this clause. Any and all delays to the vessel incurred
as a result of the foregoing shall not count as laytime or time on demurrage.


**Clause 34**
Owners guarantee that the vessel is a self trimming bulk carrier suitable for loading / carrying
/ discharging a full and complete cargo of any / all kinds of grain in bulk without bagging /
strapping/securing. The vessel to have on board at all times all relevant grain loading
booklets / manuals / certificates and hold end trimming table and vessel to be able to load
grain without shifting boards / grain fittings in accordance with 1991 amendments the
International Convention of SOLAS 1974 and has dispensation from trimming holds ends.


**Clause 35**
**Hire Payment**
Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank
account, details as below.
Charterers will not agree to the assignment of hire, monies due under this Charter Party or
the Charter Party itself in any circumstances whatsoever.

Hire payment to be made to:
**THE ROYAL BANK OF SCOTLAND**
**45, AKTI MIAOULI, 185 36 PIRAEUS**

**Clause 35**: cont.../...
**SWIFT CODE: RBOSGRAA**
**IBAN NO: GR20 0640 0010 0055 5546 3323 100**
**Correspondent Bank: J P MORGAN CHASE BANK NEW YORK**
**SWIFT CODE: CHASUS33, ABA#021000021**
**In favour of 'PIZA INVESTMENT TRUST Inc."**
**Acc no: 463323 USD 100**
**ref mv "SEA BIRD"/GLINGROW**

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers. Thereafter, hire shall be settled every 15 days in advance.
Greenwich Mean Time (G.M.T.) shall be applied for hire calculation purpose.
Notwithstanding anything contained herein to the contrary, if any time during the currency of this Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal office hours, or at any time which for reasons beyond their reasonable control would prevent Charterers from effecting payment of hire on the due date, payment of hire is to be made on the banking day immediately preceding the date on which hire becomes due. Where there is any failure to make hire payment on the due date because of an oversight or negligence or error or omission of Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days' notice to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

**Clause 36**
**Charterers' Deduction**
Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that Owners will forward to load and/or discharge agent in advance any funds required for Owners' expenses.

**Clause 37**
Communication/Entertainment/Victualling
Charterers shall pay US$ 1,300.- per month or pro rata in lieu of communication /entertainment / victualling.

**Clause 38**
**Delivery/Redelivery Notice**
Delivery Notices: on fixing and then daily notices.
Redelivery Notices: 15 days approximate and 5/3/2/1 days definite notice of redelivery date and port.

**Clause 39**
**Stevedore Damage Clause**
Stevedores shall be employed at the risk of and paid for by the Charterers. Tt is understood that all tallying is to be for Charterers' account.
Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.
In the event of stevedore damage:
a) Such damage to be entered into the vessel's log book.

**Clause 39: cont.../...**
b) Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.
c) If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.
d) Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.
e) Master to endeavour to secure the admission of liability from the party causing damage, unless damage should have been good in the meantime by them.

**Clause 40**
**P and I Club**
Owners guarantee that the vessel is fully covered by the West of England. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

**Clause 41**
**Return Insurance**
As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

**Clause 42: War Risk**
Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.
The vessel's hull and machinery value of fixing is USD 7,000,000.-

**Clause 43**
**On/Off-Hire Survey**
Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

Only time actually lost, if any, to be deducted as off-hire.

**Clause 44**
**Hold Cleaning**
On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and

**Clause 44: cont.../...**
extra cleaning expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.
Charterers' option to redeliver the vessel unclean paying lumpsum USD 4,500.00 in lieu of hold cleaning.

**Clause 45**
**Bills of Lading**
The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's and tally clerk's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.
In the event that the original Bills of Lading are not available at discharge port, Owners/ Master to allow discharge of cargo against a Letter of Indemnity as per Owners' P+I Club form signed by Charterers.
No liner or through Bills of Lading may be issued/used during the currency of present Charter Party.

**Clause 46**
**ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.
Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.
Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full noncompliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

**Clause 47**
**Deratisation Certificate**
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The vahdity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

**Clause 48**
**Quarantine/Smuggling**
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack

**Clause 48**: cont.../...
of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

## Clause 49
**Health Certificate**
The Owners shall arrange at their expense that Master, Officers and crew of vessel hold vahd vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

## Clause 50
**Vessel's Equipment**
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

## Clause 51
**Safety Regulation**
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

## Clause 52
**Canal Certificate**
The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

## Clause 53
**Crew Service**
During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:
a) At each port all of the hatch opening and closing;
b) Preparing vessel for sea;
c) Removal and disposal of dunnage to be for Charterers' account;
d) Gangway watchmen for the vessel to be for Owners' account. Compulsory cargo watchmen to be for Charterers' account;
e) Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, derricks and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

## Clause 54
**War Cancellation**

If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. Tn all cases, hire shall be paid until vessel's redelivery.

## Clause 55
**Requisition**

Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

## Clause 56
**Extra Period**

Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

## Clause 57
**Cancellation Clause**

If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

## Clause 58
**Capture/Seizure/Arrest**

Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

## Clause 59
**Cargo Claim**

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' liability could be involved under the terms of this Charter Party, the Owners, subject to Owners' P and I Club's approval, will authorise the Charterers' Agents at the discretion of the latter parties specifically in each and every case, to extend the time of suit on their behalf beyond the statutory one year of the Hague Rules and of the relevant legislation in the countries of their enactment, it being understood that a similar extension is to be granted on behalf of the Charterers.

**Clause 59: cont.../...**
The so granted extension shall not prejudice the ultimate responsibility of both parties. Owners agree that liability for cargo claims as between Owners and Charterers shall be apportioned as specified by the Interclub New York Produce Exchange agreement as amended May 1984 or any subsequent amendments thereto.


**Clause 60**
**Small Claims Procedure Clause**
Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.


**Clause 61**
**Deviation/Put Back**
Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of he Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.


**Clause 62**
**Water Pollution**
A. For Bulk Carriers:
(1) Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:
(a) Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section l32l(p)) up to (insert the date upon which such certificate(s) is/are due to expire).
(b) Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).
(2) Notwithstanding anything whether printed or typed herein to the contrary:
(a) Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.
(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

**Clause 62: cont.../...**
(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

**Clause 63**
**Owners' Agents**
Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

**Clause 64**
**Taxes**
Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

**Clause 65**
**Paramount Clause**
Referring to Clause 24, Charterers have the option to substitute U.S. Clause Paramount by another Clause Paramount relevant to the trade in question.

**Clause 66**
**Additional Clause**
New Jason Clause, P and 1 Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.
Conwartime 2004 to apply.

**Clause 67**
**Drydock Clause**
The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

**Clause 68**
**Unique Bill(s) of Lading Clause**
The Charterers warrant that each transport document accompanying a shipment of cargo to or from a port or place in the U.S.A. shall be endorsed with a unique Bill(s) of Lading identifier, as required by the U.S. Customs Regulation (19 CRF Part 4 Section 4.7 A) including subsequent changes, amendments or modifications thereto, not later than the first port of call. Non-compliance with the provisions of this Clause shall amount to a breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners

**Clause 68: cont.../...**
harmless and shall keep them indemnified against all claims whatsoever which may arise and
be made against them.
Furthermore, all time lost and all expenses incurred including fines as a result of the
Charterers' breach of the provisions of this Clause shall be for Charterers' account.


**Clause 69**
**Bulk Carrier Safety Clause**
(A) The Charterers shall instruct the terminal operators or their representatives to cooperate
with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo
operations strictly in accordance with the guidelines set out therein.
(B) In addition to the above and notwithstanding any provision in this Charter Party in
respect of loading/discharging rates, the Charterers shall instruct the terminal operators to
load/discharge the vessel in accordance with the loading/discharging plan, which shall be
approved by the Master with due regard to the vessel's draught, trim, stability, stress or any
other factor which may affect the safety of the vessel.
(C) At any time during cargo operations, the Master may, if he deems it necessary for
reasons of safety of the vessel, instruct the terminal operators or their representatives to
slow down or stop the loading or discharging.
(D) Compliance with the provisions of this Clause shall not affect the counting of hire.


**Clause 70**
**Stowaway Clause**
Any time lost including but not limited to time on demurrage and any losses, liabilities and
cost incurred by reason of stowaways on board shall be for Owners' account.


**Clause 71**
**Ocean Route Clause**
Charterers have the option of supplying independent weather routing company's advice to
Master during voyage. At Charterers' expense, the Master shall comply with reporting
procedure.

The Vessel shall be capable of steaming on good weather described during the currency of
this Charter Party. "Good weather conditions" shall be defined as weather conditions in winds
not exceeding Beaufort 4, Douglas Sea State 3, no adverse currents, no negative influence
of swell.

However, the final decision as to the routeing is always to be with the Master when
considering safety of the vessel, crew and cargo. The Master shall provide as necessary wind
and sea condition reports taken from the vessel's log book and weather service reports.

In case of consistent discrepancy between vessel's log books and the weather company's
report, then another independent weather routeing company is to mutually appointed/chosen
by both parties and that company's report will be taken as ruling for settlement of any
performance claims.


**Clause 72**
**Mobile Crane Clause**
Deleted.

## Clause 73
**Split Bills of Lading Clause**
Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

## Clause 74
**Oil Pollution**
As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting from noncompliance with this Clause. Any and all delay to the vessel resulting from such noncompliance shall not count as laytime or, if laytime has expired, as time on demurrage.

## Clause 75
Vessel's Officers/crew to be covered for the duration of this Charter Party by an I.T.F. agreement or other bona fide trade union agreement conforming to I.T.F. standards.

## Clause 76
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

## Clause 77
Deleted.

## Clause 78
**ISPS Clause**
(a) (i) From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant Tnternational Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).
(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.
(b) (i) The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub- Charterers are likewise provided

**Clause 78: cont.../...**
to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision: "The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".
(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.
(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses directly arising from vessel's ownership or other crewing matters.
(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

**Clause 79**
All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

**Clause 80**
Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

**Clause 81**
Owners to provide following certificates as per L/C requirements (see attached):
1. Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and i) club having representative or agent in Jordan.
2. Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified lOOal or its equivalent and free from any outstanding recommendations.

**Clause 82**
Owners to supply only natural hold separation. Any additional separations if required to be provided by Charterers at their sole time, risk and expenses.

**Clause 83**
Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

**BOTH-TO-BLAME COLLISION CLAUSE**

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the neghgence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.


**GENERAL AVERAGE AND THE NEW JASON CLAUSE**

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

**New Jason Clause**

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

**BALTIME 1939 WAR CLAUSE**

(A) The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B) Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their

interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C) In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D) The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E) In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo in board.

(F) If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

## P. AND I. BUNKER CEAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

## SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request

Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

**BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005**
(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).
(B) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:
(i) The vessel shall comply with regulations 14 and 18 of Marpol Annex VT and with the requirements of any emission control zone; and
(ii) The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.
Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.
(C) For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

# EXHIBIT 2

CODE NAME: "CONGENBILL". EDITION 1994

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

**B/L No. 1**

| | |
|---|---|
| Shipper<br>ROSINTERAGROSERVIS LTD RUSSIA KRASNODAR,<br>BURGASSKAYA 56 FOR AND ON BEHALF OF RIAS<br>TRADING SA ON BEHALF OF CONSIGNOR EGYPTIAN<br>TRADERS CO.S.A.E. | Reference No. |

Consignee

**THE GENERAL AUTHORITY FOR SUPPLY COMMODITIES,
CAIRO, EGYPT**

COPY
NON-NEGOTIABLE

Notify
**GENERAL COMPANY FOR SILOS AND WAREHOUSING, CAIRO, EGYPT**

| Vessel<br>**M/V "SEA BIRD"** | Port of Loading<br>**NOVOROSSIYSK RUSSIAN PORT** |
|---|---|

Port of Discharge
**SAFAGA RED SEA EGYPTIAN PORT**

| Shipper's description of goods<br><br>**RUSSIAN WHEAT FROM LATEST CROP, IN BULK** | Weight<br>**27 000,000 M/TONS** |
|---|---|

**CLEAN ON BOARD
FREIGHT PAYABLE AS PER CHARTER PARTY
DC NO. TFC/IMP/009/0526**

(of which NIL on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

| Freight payable as per C/P dated 15.04.2009 | SHIPPED at the Port of Loading in apparent good order and condition |
|---|---|
| | on board the Vessel for carriage to the Port of Discharge or so near there to |
| | as she may safely get the goods specified above. |
| | Weight, measure, quality, quantity, condition, contents and value unknown. |
| | IN WITNESS whereof the Master or Agent of the said Vessel has signed the |
| Received on account of freight: | number of Bills of Lading indicated below all of this tenor and date, any one of |
| | which being accomplished the others shall be void. |
| | |
| Time used for loading ............ days ............ hours. | FOR CONDITION OF CARRIAGE SEE OVERLEAF |

| Freight payable at<br>**FREIGHT PAYABLE AS PER CHARTER<br>PARTY** | Place and date of issue<br>**NOVOROSSIYSK          30.04.2009<br>RUSSIAN PORT** |
|---|---|
| Number of original Bs/L<br>**THREE (3)** | RSS GROUP<br>**GLOBAL OCEAN<br>AGENCY LTD.** |
| | **GLOBAL OCEAN AGENCY LTD. AS AGENT<br>ONLY FOR AND ON BEHALF OF<br>MASTER OF M/V "SEA BIRD"<br>CAPT.     ROGELIO B. NOVENO** |

Page 1

# BILL OF LADING

TO BE USED  WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994 ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1)  All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.

    (a)  The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

    *(b) Trades where Hague-Visby Rules apply.*
    In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

    (c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.
If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessel belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight,
destination, etc., see overleaf.

# EXHIBIT 3

CODE NAME: "CONGENBILL". EDITION 1994

**BILL OF LADING**     B/L No. 2

TO BE USED WITH CHARTER-PARTIES

Shipper

**ROSINTERAGROSERVIS LTD RUSSIA KRASNODAR, BURGASSKAYA 56 FOR AND ON BEHALF OF RIAS TRADING SA**

Reference No.

COPY
NON-NEGOTIABLE

Consignee

**TO ORDER**

Notify

**EGYPTIAN TRADERS COMPANY S.A.E. EL WATANEYA TOWERS, 14TH OF MAY ROAD, SEMOUHA, AND ALEXANDRIA 21615 EGYPT**

| Vessel | Port of Loading |
|---|---|
| M/V "SEA BIRD" | NOVOROSSIYSK, RUSSIA |

Port of Discharge
**SAFAGA RED SEA, EGYPT**

| Shipper's description of goods | Weight |
|---|---|
| **RUSSIAN WHEAT FROM LATEST CROP, IN BULK** | **29 740,000 M/TONS** |

**CLEAN ON BOARD**
**FREIGHT PREPAID**

(of which NIL on deck at Shipper's risk; the Carrier not being responsible for loss or damage howsoever arising)

| Freight payable as per C/P dated 15.04.2009 | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near there to as she may safely get the goods specified above. Weight, measure, quality, quantity, condition, contents and value unknown. IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
|---|---|
| Received on account of freight: | |
| Time used for loading . ................. days ..................... hours. | FOR CONDITION OF CARRIAGE SEE OVERLEAF |

| Freight payable at | Place and date of issue |
|---|---|
| **FREIGHT PREPAID** | **NOVOROSSIYSK,     30.04.2009 RUSSIA** |
| Number of original Bs/L **THREE (3)** | Signature GLOBAL OCEAN AGENCY LTD. |

**GLOBAL OCEAN AGENCY LTD. AS AGENT ONLY FOR AND ON BEHALF OF MASTER OF M/V "SEA BIRD"**
**CAPT.     ROGELIO B. NOVENO**

# BILL OF LADING

TO BE USED  WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994 ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

## Conditions of Carriage

(1)  All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.

(a)  The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

(b) Trades where Hague- Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague-Visby Rules - apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c) The Carrier shall in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.
If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods' to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight,
destination, etc., see overleaf.

# EXHIBIT 4

# HELLENIC STAR SHIPPING COMPANY S.A.

**M/V  SEA BIRD**            **C/P DD :   15/4/2009   F.70**
**ON T/C TO :  GLINGROW HOLDING**

## HIRE STATEMENT

| | | | | | |
|---|---|---|---|---|---|
| DELIVERED: | 20/4/09 14:18 GMT | WITH 1,330 M/T IFO & | 103.50 M/T MDO | & 126.21 M/T LSFO |
| REDELIVERED: | 8/8/09 14:18 GMT | WITH 1,330.990 M/T IFO & | 103.500 M/T MDO | & 126.21 M/T LSFO |

| | | | |
|---|---|---|---|
| HIRE    20/4/09 14:18  GMT -    8/8/09 14:18  GMT | | 1,320,000.00 | |
| = 110.000000 DAYS x    $12,000.00  PER DAY | | | |
| | | | |
| BALLAST BONUS | | 0.00 | |
| | | | |
| IFO ON DELIVERY,    M/T 1,330.99 x    $300.00 | | 399,297.00 | |
| LSFO ON DELIVERY,    M/T 126.21 x    $0.00 | | 0.00 | |
| MDO ON DELIVERY,    M/T 103.50 x    $470.00 | | 48,645.00 | |
| | | | |
| INTERMED HOLDS CLEANING    HOLDS: 7    Amount/Hold: | | | |
| INTERMED HOLDS CLEANING    HOLDS: 7    Amount/Hold: | | | |
| IN LIEU OF HOLDS CLEANING | | 4,500.00 | |
| | | | |
| CABLES ETC.    Amount/Month: $1,250.00 | | 4,520.53 | |
| | | | |
| COMMISSIONS   3.75%  ON HIRE | | | 49,500.00 |
| | | | |
| IFO ON REDELIVERY    M/T 1,330.99 x    $300.00 | | | 399,297.00 |
| LSFO ON REDELIVERY    M/T 126.21 x    $0.00 | | | 0.00 |
| MDO ON REDELIVERY    M/T 103.50 x    $470.00 | | | 48,645.00 |
| | | | |
| CHARTERERS' REMIT/CE    23/04/09 | | | 321,545.00 |
| CHARTERERS' REMIT/CE    06/05/09 | | | 30,255.00 |
| CHARTERERS' REMIT/CE    19/05/09 | | | 58,445.88 |
| CHARTERERS' REMIT/CE    27/05/09 | | | 92,671.24 |
| CHARTERERS' REMIT/CE    03/06/09 | | | 81,219.86 |
| CHARTERERS' REMIT/CE    09/06/09 | | | 81,149.18 |
| CHARTERERS' REMIT/CE    17/06/09 | | | 80,850.00 |
| | | | |
| CLAIM FOR DAMAGES: | | | |
| DIFFERENCE BETWEEN MARKET HIRE RATE OF $ 22,000 AND | | | |
| CHARTER HIRE RATE OF $ 12,000 = $ 10,000 X 64 DAYS (FROM | | | |
| 05/06/09 TO08/08//09) LESS 3.75% COMMISSIONS | | 616,000.00 | |
| | | | |
| | | $2,392,962.53 | $1,243,578.16 |
| | | | $1,149,384.37 |
| BALANCE DUE TO OWNERS | | $2,392,962.53 | $2,392,962.53 |

8/7/2009

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

SEA BIRD SHIPPING LTD.,

Plaintiff,                    09 CV

-v-                                       **ATTORNEY'S DECLARATION
                                          THAT DEFENDANT
                                          CANNOT BE FOUND
                                          WITHIN THE DISTRICT**

ROSINTERAGROSERVIS LTD.,

Defendant.
-----------------------------------------------------------------x

This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff,

SEA BIRD SHIPPING LTD., in order to secure the issuance of a Summons and Process of

Maritime Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of

perjury:

I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above

referenced matter.

I am familiar with the circumstances of the Verified Complaint, and I submit this

declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment

and Garnishment of the property of the defendant, ROSINTERAGROSERVIS LTD., pursuant to

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the defendant in

this District.

I have personally checked with the office of the Secretary of State of the State of New

York, using the Secretary of State's Division of Corporations database, and I have determined

Chalos & Co Ref: 2144.001

that, as of July 8, 2009, the defendant is not incorporated pursuant to the laws of New York, and

have not nominated any agent for the service of process within the Southern District of New

York.

I have inquired of Verizon Telephone Company whether the defendant can be located

within this District.  The Verizon Telephone Company has advised me that the defendant does

not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I

have found no separate telephone listings or addresses for the defendant within this District.

I have engaged in a Google search as to whether the defendant can be located within this

District.  The Google search results did not provide any information that defendant is found in

this District.

I am unaware of any general or managing agent(s) within this District for the defendant.

In that I have been able to determine that the defendant has not appointed an agent for

service of process within the Southern District of New York and that I have found no indication

that the defendant can be found within this District for the purposes of Rule B, I have formed a

good faith belief that the defendant does not have sufficient contacts or business activities within

this District and do not have any offices or agents within this District to defeat maritime

attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set

forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendant cannot be found

within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty

and Maritime Claims of the Federal Rules of Civil Procedure.

Chalos & Co Ref: 2144.001

Dated: Oyster Bay, New York
       July 8, 2009

                              CHALOS & CO, P.C.
                              Attorneys for Plaintiff
                              SEA BIRD SHIPPING LTD.

                    By:       _____
                              George M. Chalos (GC-8693)
                              123 South Street
                              Oyster Bay, New York 11771
                              Tel: (516) 714-4300
                              Fax: (516)750-9051
                              Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SEA BIRD SHIPPING LTD.,

                                   Plaintiff,                    09 CV

-v-
                                                           **VERIFICATION OF**
                                                           **COMPLAINT**

ROSINTERAGROSERVIS LTD.,

                                   Defendant.
-------------------------------------------------------------------x

       Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of

perjury:

       1.     I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff,

SEA BIRD SHIPPING LTD., herein;

       2.     I have read the foregoing Verified Complaint and know the contents thereof; and

       3.     I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its agents, underwriters and

attorneys.

       4.     The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

       I declare under penalty of perjury that the foregoing is true and correct.

Chalos & Co Ref: 2144.001

Dated: Oyster Bay, New York
        July 8, 2009

                        CHALOS & CO, P.C.
                        Attorneys for Plaintiff
                        SEA BIRD SHIPPING LTD.

        By:             _____
                        George M. Chalos (GC-8693)
                        123 South Street
                        Oyster Bay, New York 11771
                        Tel: (516) 714-4300
                        Fax: (516) 750-9051
                        Email: gmc@chaloslaw.com